**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | Case No. 13-mj-3055-SAG |
| | * | |
| **HANEEF Q. ROSS** | * | |
| | * | |
| ************ | | |

**MEMORANDUM OPINION**

On March 30, 2015, a bench trial was held as to Count One of the Supplemental Information charging Haneef Ross with "disorderly conduct" in violation of 32 C.F.R. § 228.13, (Disturbances on protected property). At the close of all evidence, Mr. Ross moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). After cursory oral argument and consultation with counsel, the Court ordered the parties to brief the merits of Mr. Ross's motion.[1] Accordingly, now pending before the Court is Mr. Ross's Motion for Judgment of Acquittal. [ECF No. 57]. The Court has also considered the Government's opposition and Mr. Ross's reply. [ECF Nos. 61, 64]. For the reasons set forth below, Mr. Ross's Motion for Judgment of Acquittal is GRANTED.

**I.     BACKGROUND**

On November 22, 2013, Mr. Ross visited the National Security Agency ("NSA") property located on Fort George G. Meade ("Fort Meade").[2] According to the trial testimony of three officers then on duty, Mr. Ross arrived at the NSA vehicle cargo inspection facility as a

---

[1] For the purpose of Mr. Ross's motion, the parties agreed to work from memory regarding the testimony at the trial, rather than having a transcript prepared. However, the Court had access to an audio recording of the trial, which it referred to regularly in drafting this opinion. The parties also agreed to defer closing argument pending the outcome of the motion.

[2] At trial, Mr. Ross's counsel objected to the Court's ability to take judicial notice of the special maritime and territorial jurisdiction of the United States on Fort George G. Meade. Because the Court is ruling in Mr. Ross's favor on his Motion for Judgment of Acquittal, the jurisdictional issue is irrelevant to the outcome of this case.

passenger in a "white painter's van" driven by John Rouse. At the request of another officer, Officer Harris exited the office and approached Mr. Rouse and Mr. Ross, both of whom had exited the van. As Officer Harris approached, Mr. Ross was waving his arms. Officer Harris put out a radio call requesting assistance from a supervisor, to which Sergeants Gezik and Myatt responded. Officer Harris thereafter interacted only with Mr. Rouse, who explained that he was there to arrest and "put charges on" Officer Harris.

As Sergeant Gezik approached the men, Mr. Ross was standing to the side of the van, pacing back and forth with clenched fists, punching them toward the ground. Sergeant Gezik instructed Mr. Ross to turn around and place his hands behind his back, to which Mr. Ross responded "no." Sergeant Gezik repeated his request, and Mr. Ross again responded "no." Sergeant Myatt then arrived on the scene, approaching Mr. Ross from behind; Sergeant Gezik remained in front of Mr. Ross. Upon reaching Mr. Ross, Sergeant Myatt immediately ordered Mr. Ross to put his hands behind his back with palms facing each other, and with his fingers facing toward Sergeant Myatt. Mr. Ross said "no." Sergeant Myatt repeated the same order, to which Mr. Ross again responded "no." It appeared to Sergeant Myatt that Mr. Ross was attempting to comply but did not understand the instructions. Accordingly, Sergeant Myatt gave Mr. Ross "easier instructions to follow," asking Mr. Ross to first get down on one knee, then the other, and then to place his hands behind his back, keep them there, and not move. Mr. Ross complied with Sergeant Myatt's simplified instructions, and Sergeant Myatt handcuffed Mr. Ross. In Sergeant Myatt's opinion, prior to being handcuffed, Mr. Ross's demeanor appeared "agitated," and his voice was "elevated." As soon as Mr. Ross was handcuffed, his demeanor became "cooperative," and it remained "cooperative" for the remainder of his encounter with Sergeant Myatt.

Once Mr. Ross was handcuffed, Sergeant Myatt placed him in a chair and asked Mr. Ross why he and Mr. Rouse had returned to the checkpoint (referring to a prior November 18, 2013, visit to the NSA vehicle inspection facility). Mr. Ross did not respond. Sergeant Myatt then asked Mr. Ross about comments he had made to officers on his previous visit. Mr. Ross smirked, but again did not respond to Sergeant Myatt's question.

Officer Harris and Sergeants Gezik and Myatt testified that their interactions with Mr. Rouse and Mr. Ross caused the only open lane of the vehicle cargo inspection facility to close for between 15 and 30 minutes. By contrast, Sergeant Myatt testified that a typical vehicle inspection takes one or two minutes. Officer Harris testified that eight officers at the facility were occupied as a result of Mr. Rouse's and Mr. Ross's presence because "they" were being combative, arguing, cursing, and not cooperating. Accordingly, the officers did not have the man-power to open the second inspection lane, and as a result, traffic at the facility backed up. Officer Harris also testified that all of the threats and statements directed toward him were made by Mr. Rouse, and that he did not personally hear Mr. Ross make any threats or statements.

## II. PROCEDURAL HISTORY

On November 22, 2013, Mr. Ross was issued two citations alleging violations of 32 C.F.R. § 228.13 for: (1) "failure to display government or other identifying credentials to an NSAP Police officer while on Protected Property"; and (2) "Attempting to enter protected property without proper authorization." Def.'s Reply, Ex 1 at 1–2. On November 26, 2013, after a formal charging decision, Mr. Ross was issued seven additional citations in connection with his November 22, 2013, visit to the NSA property.[3] Two citations charged Mr. Ross with

---

[3] The seven additional citations state that their subject offenses occurred on November 26, 2013, at 15:00. However, at trial, Officer Harris testified that the citations pertained to Mr. Ross's conduct on November 22, 2013.

"[i]nfluencing, impeding or retaliating against a federal law enforcement officer," in violation of "18 U.S.C. § 115B." [ECF Nos. 7, 8]. Two citations charged Mr. Ross with "[a]ssaulting, resisting, or impeding certain officers or employees," in violation of 18 U.S.C. § 111. [ECF Nos. 4, 5]. One citation charged Mr. Ross with "[h]arassment," in violation of "18 U.S.C. 13 MD 3-803." [ECF No. 6]. Two additional citations charged Mr. Ross with "engaging in disorderly conduct while on protected property," in violation of 32 C.F.R. § 228.13. [ECF Nos. 1, 3].

Two days prior to Mr. Ross's initially scheduled trial, the Government filed a two-count Information. [ECF No. 12]. Count One of the Information alleged that, on November 18, 2013, Mr. Ross "unlawfully did influence, impede or retaliate against NSA Officer Jayson Myatt by stating to the law enforcement officer 'There will be consequences' and continued with obscene and vulgar language," in violation of 32 C.F.R. § 228.13. [ECF No. 12]. Count Two of the Information alleged that, on November 22, 2013, Mr. Ross "unlawfully did assault NSA Officer Jayson Myatt by refusing to be handcuffed by said officer and shouting obscenities to the officer, while the said officer was in the execution of his duties," in violation of 18 U.S.C. § 111. [ECF No. 12].

One day prior to Mr. Ross's rescheduled trial, the Government filed a two-count Supplemental Information. [ECF No. 17.] Count One of the Supplemental Information alleged that, in violation of 32 C.F.R. § 228.13:

> On or about November 22, 2013, at or near the Vehicle Cargo Inspection Facility at the National Security Agency, located on Fort George G. Meade, Maryland, an area within the special maritime and territorial jurisdiction of the United States, in the State and District of Maryland, HANEEF ROSS unlawfully did engage in disorderly conduct to wit: arguing with and refusing to comply with the orders of NSA Officers Jayson Myatt and Matthew Gezik.

[ECF No. 17]. Count Two of the Supplemental Information, which was voluntarily dismissed by the Government prior to another rescheduled trial, alleged that on November 18, 2013, Mr. Ross "unlawfully did forcibly intimidate NSA Officers Jayson Myatt and Bryan Morges by making threatening remarks to the officers, while the said officers were in the execution of their official duties," in violation of 18 U.S.C. § 111. Accordingly, on the date of Mr. Ross's bench trial, Count One of the Supplemental Information was the only remaining charge against him.

### III. STANDARD OF REVIEW

Federal Rule of Criminal Procedure 29 permits a defendant to move for a judgment of acquittal after the close of all evidence. Fed. R. Crim. P. 29(a). The court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." *Id.* In considering a motion for judgment of acquittal, the court "considers whether a rational trier of fact could find the Defendant guilty beyond a reasonable doubt based on the evidence produced at trial, viewed in the light most favorable to the Government." *United States v. Riley*, 21 F. Supp. 3d 540, 543 (D. Md. 2014) (citing *United States v. Wilkins*, 58 F. App'x 959, 961 (4th Cir. 2003)).

### IV. ANALYSIS

Mr. Ross is alleged to have committed "disorderly conduct," in violation of 32 C.F.R. § 228.13, which provides in its entirety:

> Any conduct which impedes or threatens the security of protected property, or any buildings or persons thereon, or which disrupts the performance of official duties by Agency employees, or which interferes with ingress to or egress from protected property is prohibited. Also prohibited is any disorderly conduct, any failure to obey an order to depart the premises, any unwarranted loitering, any behavior which creates loud or unusual noise or nuisance, or any conduct which obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways or parking lots.

No cases have construed "disorderly conduct" in the context of § 228.13 or, for that matter, any of the other offenses listed in that regulation.

In his Motion for Judgment of Acquittal, Mr. Ross argues that the provision of § 228.13 which prohibits "disorderly conduct" is ambiguous, and that the ambiguity is not cured by employing the traditional rules of statutory interpretation. As such, Mr. Ross contends that the ambiguity must be resolved in favor of lenity, in accordance with *Yates v. United States*, 135 S. Ct. 1074, 1088 (2015). When so construed, Mr. Ross claims that the evidence introduced at trial does not warrant a finding that he was guilty of disorderly conduct beyond a reasonable doubt. The Government argues that the Court need not confront whether the prohibition against disorderly conduct is ambiguous, because Mr. Ross violated the clauses of § 228.13 proscribing conduct "which disrupts the performance of official duties by Agency employees, or which interferes with ingress to or egress from protected property."

### A. Conduct Which Disrupts the Performance of Official Duties by Agency Employees, or Which Interferes With Ingress to or Egress from Protected Property

The Government contends that, based on the evidence produced at trial, a rational trier of fact could determine that Mr. Ross "disrupted the performance of official duties by employees of the [NSA]," and "interfere[d with] ingress to and egress from the protected property," in violation of 32 C.F.R. § 228.13, and that Mr. Ross's Motion for Judgment of Acquittal should thus be denied. Govt.'s Opp. 3.

#### 1. Fatal Variance

Mr. Ross argues that finding him guilty of Count One of the Supplemental Information by means not alleged therein would constitute a fatal variance, in violation of his Sixth Amendment rights. A variance occurs when the Government, "through its presentation of

6

evidence and/or its argument . . . broadens the bases for conviction beyond those charged in the indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999). A variance is fatal where "the indictment is altered to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment."[4] *Id.* (internal quotation marks omitted).

In support of its argument that Mr. Ross may be found guilty of "disorderly conduct" by committing any conduct prohibited by 32 C.F.R. § 228.13, the Government relies solely upon *United States v. Darrah*, a case from the United States District Court for the District of Michigan. In *Darrah*, the defendant was charged with and convicted of "disorderly conduct" by impeding ingress to or egress from a post office, in violation of 39 C.F.R. § 232.1(e), a federal regulation which governs disturbances on postal property. *Darrah*, 2015 WL 403903, at *1, 3. However, the regulation at issue in *Darrah* is critically distinguishable from § 228.13. The postal service regulation at issue in *Darrah* states:

> Disturbances. Disorderly conduct, or conduct which creates loud and unusual noise, or which impedes ingress to or egress from post offices, or otherwise obstructs the usual use of entrances, foyers, corridors, offices, elevators, stairways, and parking lots, or which otherwise tends to impede or disturb the public employees in the performance of their duties, or which otherwise impedes or disturbs the general public in transacting business or obtaining the services provided on property, is prohibited.

---

[4] A variance is typically fatal because it violates the Fifth Amendment's provision that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury." U.S. Const. amend. V; s*ee Randall*, 171 F.3d at 203. The Fifth Amendment is inapplicable in this case because Mr. Ross has not been charged with a capital or otherwise infamous crime and has not been indicted by a grand jury. However, a variance may also fatally infringe upon a defendant's Sixth Amendment right "to be informed of the nature and cause of the accusation" against him. U.S. Const. amend. VI; *see, e.g., United States v. Ellis*, 121 F.3d 908, 923 (4th Cir. 1997) (explaining that a defendant may be prejudiced by a fatal variance by being surprised at trial or hindered in the preparation of his defense); *United States v. Darrah*, No. 13-51423, 2015 WL 403903, at *5 (E.D. Mich. Jan. 22, 2015) ("A variance may trench upon a defendant's right under the Sixth Amendment.").

39 C.F.R. § 232.1(e). In *Darrah*, the court determined that, under the Postal Service regulation, disorderly conduct and conduct that impedes public employees are not two different offenses. *Darrah*, 2015 WL 403903, at *6. In so holding, the court emphasized that, "the language of the regulation prohibits both types of conduct in the same sentence, suggesting that one is a species of the other," and concluded that, "[t]he regulation defines disorderly conduct in several ways, which serves notice that a person charged with that offense must be prepared to defend against such accusations." *Id.* By contrast, § 228.13 is comprised of two separate sentences. The first sentence prohibits conduct which disrupts NSA employee duties or which interferes with ingress/egress. 32 C.F.R. § 228.13. The second sentence then begins: "Also prohibited is any disorderly conduct." *Id.* Three facts counsel against any inference that, under § 228.13, disruption of NSA employee duties and interference with ingress/egress are somehow types of disorderly conduct: (1) that the prohibitions against disruption of NSA employee duties and interference with ingress/egress are in a different sentence than the prohibition against disorderly conduct; (2) that disruption of NSA employee duties and interference with ingress/egress are mentioned prior to, rather than after, disorderly conduct; and (3) that "disorderly conduct" is preceded by the phrase, "[a]lso prohibited is," which suggests a new category of offenses distinguishable from those mentioned in the first sentence.

The court's determination in *Darrah* was based in part on the fact that the defendant did not "identify the elements of disorderly conduct under the regulation" or argue "whether or how 'disorderly conduct' and conduct that 'impedes' public employees differ." *Darrah*, 2015 WL 403903, at *6. However, the very argument that a fatal variance exists implies a contention that the elements of the charged offense differ from those of the proven offense. More importantly, in this case, Mr. Ross has submitted a lengthy motion in which he argues that "disorderly

8

conduct" as used in § 228.13 is ambiguous, and attempts to elucidate the offense's elements. Thus, while both this case and *Darrah* consider the offense of "disorderly conduct," the differences between the two regulations at issue, coupled with the arguments raised by Mr. Ross, render the cases readily distinguishable.

The unique and lengthy procedural history in this case also sets it apart from *Darrah*. The Supplemental Information here not only sets forth "disorderly conduct" as the committed offense, but also specifies the precise manner in which the offense was committed, namely "arguing with and refusing to comply with the orders of NSA Officers Jayson Myatt and Matthew Gezik." [ECF No. 17]. In the face of such specific allegations, it is hard to imagine how Mr. Ross might have known to prepare a defense to allegations that he disrupted NSA employee duties or interfered with ingress/egress based solely on Count One's reference to § 228.13, which also proscribes a host of other activities Mr. Ross was not charged with. Additionally, none of the previous charging documents in this case's lengthy procedural history—including the seven citations, the Information, and Count Two of the Supplemental Information—allege that Mr. Ross interfered with ingress to or egress from the protected property.[5] [ECF Nos. 1, 3, 4, 5, 6, 7, 8, 12, 17]. Accordingly, even if the Court determined that the Government had introduced sufficient evidence to sustain a conviction for disrupting the performance of official duties by NSA employees, or for interfering with ingress to or egress from the NSA property, it would violate Mr. Ross's Sixth Amendment rights to use that evidence to sustain a conviction for disorderly conduct, the offense with which Mr. Ross was actually

---

[5] The two citations charging Mr. Ross with "assaulting, resisting, or impeding certain officers or employees," might arguably be construed as allegations that Mr. Ross disrupted the performance of NSA employees. *See* [ECF Nos. 4, 5]. However, the Court need not determine whether any potential notice arising from those citations would cure the Sixth Amendment violation, because, as explained below, the Government introduced insufficient evidence to allow a trier of fact to find Mr. Ross guilty of that offense. *See infra* Part IV.A.2.

charged. *See Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ("No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal.").

### 2.     **Insufficient Evidence**

Further, even if Mr. Ross could be convicted of violating § 228.13 by means not alleged in the Supplemental Information, a reasonable trier of fact could not conclude beyond a reasonable doubt, based on the evidence at trial, that Mr. Ross either disrupted the performance of official duties by NSA employees or interfered with ingress to or egress from NSA property. At trial, Officer Harris testified that the *collective* conduct of Mr. Rouse and Mr. Ross resulted in the closure of the only open vehicle inspection lane for between 15 and 30 minutes.[6] That closure caused a backup of traffic at the vehicle inspection facility, because the officers lacked the man-power to open the second inspection lane. However, the trial testimony established that only two of the eight officers present were occupied with Mr. Ross. By contrast, Officer Harris testified that he was occupied with Mr. Rouse, and that an unspecified number of other officers were assisting him. No evidence was elicited regarding how many officers would have been needed to open the second inspection lane.[7] Absent that evidence, no trier of fact could conclude, beyond a reasonable doubt, that the officers were unable to open the second inspection

---

[6] Even viewing the evidence introduced at trial in the light most favorable to the Government, it appears that the majority of that collective conduct is attributable to Mr. Rouse, rather than Mr. Ross. Officer Harris testified that "they" were yelling, cursing, and making various threats. However, upon further questioning, Officer Harris conceded that he did not hear Mr. Ross make any statements or threats. Moreover, Sergeants Gezik and Myatt, who did interact with Mr. Ross, did not offer testimony that he was yelling, cursing, or making threats.

[7] The absence of testimony on this point is additionally notable because it signals that, as discussed above, Mr. Ross was not on notice to prepare a defense to allegations that he disrupted agency duties or interfered with ingress/egress. *See supra* Part IV.A.1.

10

lane because two officers were occupied by Mr. Ross. Thus, without evidence that Mr. Ross's behavior both caused the lane closure and prevented the officers from opening a different inspection lane, a reasonable trier of fact could not conclude that Mr. Ross was guilty of interfering with ingress to or egress from NSA property or disrupting the performance of official duties by the NSA officers.[8]

### B.   Insufficient Evidence of Disorderly Conduct

When viewed in the light most favorable to the Government, the evidence introduced at trial establishes that Mr. Ross refused to comply with the orders of NSA Sergeants Myatt and Gezik, by responding "no" in an elevated voice as many as four times before he ultimately complied with Sergeant Myatt's orders. Additionally, the evidence establishes that prior to being approached by any officer, Mr. Ross was both waving his arms in the air and pacing back and forth with clenched fists which he was punching toward the ground.

The Supplemental Information alleges that Mr. Ross violated 32 C.F.R. § 228.13 by engaging in "disorderly conduct," specifically, arguing with and refusing to obey the orders of the NSA officers. As Mr. Ross accurately notes, § 228.13 does not identify the elements of "disorderly conduct." Thus, this Court considers the context of § 228.13 to discern whether Mr. Ross's actions fall within the scope of "disorderly conduct," as used therein. *See, e.g.*, *Yates v. U.S.*, 135 S. Ct. 1074 (2015) (considering the context of a provision of the Sarbanes-Oxley Act in construing the term "tangible objects" as used therein); *Marx v. Gen. Revenue Corp.*, 133 S.

---

[8] Finally, the allegation that Mr. Ross disrupted the performance of official duties by NSA employees presumably refers to the NSA officers being prevented from inspecting vehicles because they were busy detaining and questioning Mr. Ross. Although it is unnecessary to confront the issue in light of the analysis in Part IV.A.2. *infra*, the Court notes the particular quandary that arises when the offense of "disrupting the performance of official duties by Agency employees" is applied to police officers. For example, the duties of the NSA officers presumably include detaining and questioning vehicle occupants, when warranted by the circumstances, in addition to inspecting vehicles.

Ct. 1166 (2013) (considering the language of a statute and the context surrounding it in determining its construction).

### 1. Mr. Ross's Failure to Obey the Orders of Sergeants Gezik and Myatt

The second sentence of § 228.13, which begins by proscribing "disorderly conduct," does not indicate that the offenses that follow—many of which do not traditionally fall within the ambit of "disorderly conduct"—are a list of ways to commit "disorderly conduct." Rather, a plain reading of the regulation, which is written in the disjunctive, indicates that each activity enumerated therein constitutes a distinct manner in which one might create a disturbance, in violation of the regulation. Accordingly, contrary to the Government's argument, there is no indication that § 228.13 was intended to expand the realm of "disorderly conduct" beyond those behaviors conventionally encompassed by the term. Moreover, § 228.13 expressly indicates that disobeying the order of an NSA officer is not in and of itself, "disorderly conduct." After "disorderly conduct," the very next behavior forbidden by § 228.13 is "any failure to obey an order to depart the premises." If the prohibition against "disorderly conduct" encompassed the failure to obey *any* type of order given by an NSA officer, then it is unlikely that disobeying one specific type of order would have been articulated immediately thereafter as an additional means of violating the regulation. *See United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2330 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.") (quoting *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837 (1988)). Here, reading "disorderly conduct" to incorporate the failure to obey any order given by an NSA officer would render superfluous the following clause.

12

## 2. Mr. Ross's Physical Movements and Elevated Speech

The only remaining issue is whether Mr. Ross's waving his arms in the air and pacing back and forth with clenched fists, which he was punching toward the ground, or his stating "no" up to four times in an elevated voice constitutes "disorderly conduct" in violation of § 228.13. The Government suggests that "disorderly conduct" under § 228.13 should be loosely construed as "actions . . . which the reasonable person understands could result in disturbances on protected property," and "conduct that obstructs the orderly conduct of Government business." Govt.'s Opp. 11; *see United States v. Cassiagnol*, 420 F.2d 868, 873 (4th Cir. 1970) (construing a comparable regulation proscribing "unseemly or disorderly conduct" as "prohibiting conduct on federal property which is intended to and does interfere with, delay, or impede the normal and orderly conduct of government business on such federal property"). The Court need not determine whether the Government's proposed construction or some stricter construction is appropriate, because no rational trier of fact could determine that Mr. Ross's actions and statements constitute "disorderly conduct" under any construction of the term.

In upholding a conviction under a regulation comparable to § 228.13, the Fourth Circuit in *Cassiagnol* adopted the construction of disorderly conduct now endorsed by the Government, and stated:

> It would not require a high degree of intelligence or understanding for one to reasonably conclude that breaking through a line of United States marshals who were lined up between the demonstrators and the Pentagon, a government building of highly strategic importance to the defense of the United States, could subject him to charges for disorderly conduct.

420 F.2d at 873-74. The same simply cannot be said of Mr. Ross's conduct in this case, which consisted only of: (1) demonstrating agitated movements without making physical contact with others; and (2) four words spoken in an elevated voice. There is no evidence that Mr. Ross

13

continued any physical movements after he was approached by Sergeants Gezik and Myatt. Moreover, no officers testified regarding how those movements "obstructed the orderly conduct of Government business." Likewise, Sergeants Gezik and Myatt did not testify that they asked Mr. Ross to lower his voice, or that the four words he spoke with an elevated voice disrupted the orderly conduct of Government business. Absent some evidence regarding the detrimental effects of Mr. Ross's conduct, no rational trier of fact could determine that his movements or speech obstructed the normal and orderly conduct of Government business.[9] Moreover, absent some notice to Mr. Ross that the volume of his speech and his movements were unacceptable, it is difficult to conceive how Mr. Ross might reasonably have concluded that his conduct was disruptive or that he could be subject to charges for disorderly conduct. Sergeant Myatt testified that once Mr. Ross received broken-down instructions, he understood and complied in a cooperative manner. The Government adduced no evidence suggesting a willful attempt to disrupt, as opposed to a failure of understanding, as explained by Sergeant Myatt.

Finally, in this case, whether Mr. Ross's conduct delayed or impeded the normal and orderly conduct of Government business at the vehicle cargo inspection facility is inextricably linked to whether he impeded ingress to or egress from the NSA property. However, as explained above, the Government did not elicit adequate evidence to allow a reasonable trier of fact to conclude that Mr. Ross's conduct, rather than Mr. Rouse's conduct, was the cause of the lane closure and the officers' inability to open another lane. Accordingly, even viewing the evidence introduced at trial in the light most favorable to the Government, no trier of fact could

---

[9] Notably, the Government has not suggested the level of disruption necessary to delay or impede the normal and orderly conduct of Government business. However, in the context of the vehicle cargo inspection facility, common sense dictates that perfection cannot be the standard. If such were the case, any inspection which did not proceed wholly without incident might result in a vehicle's occupants being subject to disorderly conduct charges.

determine beyond a reasonable doubt that Mr. Ross engaged in disorderly conduct in violation of § 228.13.

## V.  CONCLUSION

For the foregoing reasons, Mr. Ross's Motion for Judgment of Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure is GRANTED.  An accompanying Order is entered herewith.

Dated:  July 15 2015                             /s/
                                          Stephanie A. Gallagher
                                          United States Magistrate Judge